FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

04 MAR 12  AM 7: 24

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **KRISTY BETH GRAY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil Action No. CV-02-S-2127-NE** |
| ) | |
| **LOWE'S HOME CENTERS, INC.,** ) | |
| **a corporation,** ) | ENTERED |
| ) | |
| **Defendant.** ) | MAR 12 2004 |



### MEMORANDUM OPINION

Plaintiff, Kristy Beth Gray, commenced this action in the Circuit Court for Cullman County, Alabama. Defendant, Lowe's Home Centers, Inc. ("Lowe's"), removed the action to this court on August 30, 2002, on the basis of both federal question and diversity jurisdiction, 28 U.S.C. §§ 1331, 1332.[1]

Plaintiff contends that Lowe's violated the Equal Pay Act of 1963, 29 U.S.C. § 206(d), by paying her less than male employees engaged in equal work, and that she suffered retaliation for complaining about the disparity. She also asserts state law claims for assault and battery. The action presently is before the court on defendant's motion for summary judgment.

---

[1]Doc. no. 1 (Notice of Removal).

# I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks

and citations omitted); *see also United States v. Four Parcels of Real Property*, 941
F.2d 1428, 1437 (11th Cir. 1991) (en banc).

## II. FACTUAL BACKGROUND

**A.      Lowe's Compensation Plan for Hourly Employees**

Lowe's has four salary grades for its hourly employees, designated as Salary
Grades 1, 3, 5, and 7.[2] The manager of each store determines the appropriate salary
grade, or beginning wage, for new employees. In that regard, the Compensation Plan
— known as the Strategic Training and Achievement Review program ("S.T.A.R.")
— provides that: "[e]mployees will be classified in the appropriate salary grade
based on their skills and experience. The following chart lists guidelines to be used
in determining the appropriate salary grade classification. Salary grade designation
should be based on the employee's experience and skills."[3] The referenced chart
states that those employees with less than one year of requisite skills and experience
are classified in Salary Grade 1, those with one to two years of related experience are
classified in Salary Grade 3, and those possessing two to four years of related
experience in the retail industry are classified in Salary Grade 5.[4] Salary Grade 7 was

---

[2]Doc. no. 36 (Defendant's Evidentiary Submission in Support of Summary Judgment
Motion), Ex. A (affidavit of Larry Engledow), affidavit ex. 1.

[3]*Id.*

[4]*Id.*

to be used "to attract and maintain good performing employees with exceptional knowledge and experience in specific areas such as delivery, plumbing, electrical, and home decor." Further, Salary Grade 7 required more than four years of experience in retailing and the home center industry.[5] Lowe's store managers use the outlined experience levels as a guideline for determining a new employee's starting rate of pay, but also consider other factors such as previous salary history, the level of pay sought by the employee, the reason the employee left his or her previous employment, and competition in the local market.[6]

Each salary grade consists of eight pay "steps," or progressive pay increases.[7] Those increases are in twenty-five-cent (25¢) increments, and are determined in the following manner:

> In order for an employee to receive an increase, he/she must meet ALL of the S.T.A.R. standards that are applicable to their job and complete their individual assigned training objectives since their last review.
>
> The Store Manager/Operations Manager will indicate on the Star [sic] Increase Eligibility Report whether the employee meets the S.T.A.R. standards and training objectives by circling YES or NO on the report under the appropriate heading. The Store Manager/Operations Manager will indicate if the increase is to be processed by circling YES or NO under the Process Increase column.

---

[5]*Id.*

[6]Doc. no. 36 (Defendant's Evidentiary Submission in Support of Summary Judgment Motion), Ex. A (affidavit of Larry Engledow) ¶ 5.

[7]*Id.* ¶ 7.

The report will then be faxed to Lowe's Human Resources Department at (919) 651-2600. It must be signed and dated in order for the approved increases to be processed. A confirmation Personnel Data Change (PDC) form will be forwarded to the store location confirming that the increase has been processed.

Employees who are denied a S.T.A.R. increase will continue to show up on future reports until the employee meets the standards and the increase is processed or the employee is terminated.

Any exceptions (i.e. an increase greater than $.25) to this policy must be processed on the employee's PDC form and must be approved by the District Manager.[8]

For purposes of "step" increases, S.T.A.R. reviews are conducted periodically. The length of time between reviews varies between three months and one year, depending on the employee's grade and step level.[9]

Under the S.T.A.R. program, "[a] promotion is defined as an increase in salary grade. Promotional increases can be up to $.50 and must be approved by the District Manager."[10]

## B.   Plaintiff's Pay and Employment History

Plaintiff applied for employment with Lowe's Cullman, Alabama store on February 28, 1997, seeking a position as either a cashier or stockperson.[11] Although

---

[8]*Id.*, affidavit ex. 1, at Bates-numbered page L0236.

[9]Doc. no. 36 (Defendant's Evidentiary Submission in Support of Summary Judgment Motion), Ex. A (affidavit of Larry Engledow) ¶ 7.

[10]*Id.*, affidavit ex. 1, at L0244.

[11]Doc. no. 43 (Plaintiff's Evidentiary Submission), Ex. 1 (deposition of Kristy Gray), at deposition ex. 1.

the application contained a space to indicate a desired wage, plaintiff did not record any amount.[12] Plaintiff was hired as a Cashier, and began employment with defendant on March 18, 1997.[13] Her beginning wage was $5.50 an hour.[14] Plaintiff transferred to a Customer Service Associate III position in the Home Decor Department of the Cullman store on May 17, 1997, and her wage was increased to $6.00 an hour.[15] Plaintiff received another pay raise to $6.25 an hour, on October 18, 1997, based upon her performance.[16] Shortly thereafter, on November 1, 1997, her hourly rate of pay was increased to $6.50.[17]

Plaintiff was promoted to a Team Leader position on March 21, 1998, and her wage was increased to $7.25 an hour.[18] She received another raise, to $7.50 an hour, on June 27, 1998.[19]

Plaintiff was promoted to the position of Assistant Zone Manager of the Tool Department on January 13, 1999. As one of the store's managers, plaintiff was paid

---

[12]*Id.*

[13]Doc. no. 36 (Defendant's Evidentiary Submission in Support of Motion for Summary Judgment), Ex. A (affidavit of Larry Engledow), at affidavit ex. 2.

[14]*Id.*

[15]*Id.* at affidavit ex. 3.

[16]*Id.* at affidavit ex. 4.

[17]*Id.* at affidavit ex. 5.

[18]Doc. no. 36 (Defendant's Evidentiary Submission in Support of Motion for Summary Judgment), Ex. A (affidavit of Larry Engledow), at affidavit ex. 6.

[19]*Id.* at affidavit ex. 7.

a *salary*, rather than an hourly *wage*. She also was expected to work forty-eight hours each week, rather than forty. Her salary for the managerial position was $16,640.00 a year, which was equivalent to a wage scale of $8.00 an hour.[20]

During November of 1999, about ten months after her promotion to Assistant Zone Manager of the Tool Department, plaintiff learned that she earned less than two hourly-wage, male employees, John Castles and James Pirkle, both of whom were Customer Service Associates working under her supervision. Plaintiff asked the Store Manager, Larry Engledow, for a raise.[21] Her request was granted, and plaintiff's salary was increased to an annual amount equivalent to a wage-scale of $9.00 an hour on November 13, 1999.[22] About three months later (March 4, 2000), plaintiff's salary was increased again, to an annual amount equivalent to a wage-scale of $9.12 an hour.[23]

During July of 2000, plaintiff asked Engledow to transfer her back to the Home Decor Department, because she wanted to reduce the number of hours she was required to work.[24] Engledow granted her request, and plaintiff's position was

---

[20]*Id.* at affidavit ex. 8.

[21]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 1 (deposition of Kristy Gray), at 65-66.

[22]Doc. no. 36 (Defendant's Evidentiary Submission in Support of Motion for Summary Judgment), Ex. A (affidavit of Larry Engledow) ¶ 15.

[23]*Id.* ¶ 16.

[24]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 1 (deposition of Kristy Gray), at 70.

changed from Assistant Zone Manager of the Tool Department, a salaried position, to Customer Service Associate IV in the Home Decor Department, an hourly-wage position. Although the transfer from a managerial to employee position normally would have been considered to be a demotion, Engledow requested that plaintiff's pay not be reduced to an amount less than what plaintiff had earned in her previous supervisory position.[25] During his deposition, Engledow explained:

> Any time we demote someone to a lower position there's generally a mandatory pay cut and when I did this for her benefit and for the fact that she had done a good job for me, I had requested that we did not deduct her pay or lower it back down to what it was [when plaintiff previously worked as a Customer Service Associate in the Home Decor Department]. The normal standard for that would be that it would go back to what they were [earning] at the hourly rate [on the date] that they were promoted and then any incremental annual raises would have been added back to the original salary prior to the promotion and in this case I didn't feel that was the right thing to do.[26]

## C.    Comparators

Plaintiff asserts that John Castles, James Pirkle, Chris Williams, Bud Methvin, Alan Rumsey, Roy Holmes, and Joe Shannon were paid more than she was for equal work.

### 1.    John Castles

John Castles began employment with Lowe's on March 6, 1999, as a Customer

---

[25]*Id.*, Ex. 2 (deposition of Larry Engledow), at 67.
[26]*Id.*

Service Associate IV. His initial rate of pay was $8.70 an hour.[27] He worked in the

Tool department under plaintiff's supervision, and his job duties included assisting

customers, stocking shelves, and recording special orders.[28] Larry Engledow, the

Store Manager who hired Castles, stated the following with respect to Castles's initial

rate of pay:

> Castles had been a relocation from whatever job it was he had in
> California. He was an extremely high paid employee before he had
> moved to the area and his previous income was — it was well in the
> double digits [per hour] as far as — I don't remember the exact amount
> but it was a high salary.
>
> . . . .
>
> I remember that it was a high salary and he did have background and
> knowledge in tools. And based on his previous salary I offered him
> what I paid him.[29]

When asked during deposition to describe Castles's background in tools, Engledow

stated that he did not remember.[30] Even so, the following exchange is relevant:

> Q    Going back to the fact that Mr. Castles and Mr. Pirkle both
>      worked for and reported to Ms. Gray but made more money than
>      she did, you indicated that Mr. Castles you thought had some
>      background and knowledge in tools and so I guess that would
>      justify him getting paid what he was paid. Is that your testimony?

---

[27]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 9, at 22.

[28]*Id.*, Ex. 2 (deposition of Larry Engledow), at 123.

[29]*Id.* at 52-53.

[30]*Id.* at 55.

A    That along with the fact that he was — I hired him from a higher paying salary.[31]

Additionally, Engledow's affidavit contains the following information:

Castles was hired as a CSA [Customer Service Associate] IV in March of 1999. I hired Castles at a pay rate of $8.70 per hour because he had a significant level of experience and background in tools and hardware prior to working for Lowe's. It was my intention that Castles would use his background in tools in order to sell products within his specialty. Moreover, I knew that Mr. Castles had been making a much higher salary at his previous employer than what Lowe's offers to its Customer Service Associates. In fact, he had requested at least $10.00 per hour to work at Lowe's. Therefore, I believed that in order to successfully hire  Mr. Castles, and keep him from working for a competitor, I needed to pay him at a higher rate than I would pay a Customer Service Associate who did not have the same level of experience and knowledge that Mr. Castles possessed. At the time of Plaintiff's termination, Mr. Castles' pay rate was $9.45 per hour.

At the time Castles was hired, Ms. Gray was an Assistant Zone Manager in the Tools Department.  However, Ms. Gray's sales experience at Lowe's was in the Home Decor Department, and it was my belief that her knowledge and experience in tools was significantly less than Castles. Further, Ms. Gray's primary responsibility was to assist in the management of the Tools Department; whereas Mr. Castle's [sic] primary responsibility was to use his background and product knowledge in Tools to sell merchandise. I placed a higher value on Mr. Castle's [sic] responsibility in this regard. In fact, it was not uncommon for Customer Service Associates with significant experience in a particular area to earn more than Assistant Zone Managers due to the high priority the store places on selling its products and servicing customers.[32]

---

[31]*Id.* at 59-60.

[32]Doc. no. 36 (Defendant's Evidentiary Submission in Support of Motion for Summary Judgment), Ex. A (affidavit of Larry Engledow) ¶¶ 20 & 21 (paragraph numbering omitted).

### 2.    James Pirkle

According to the chart contained in the record reflecting the names, positions, pay rates, and dates of employment of employees in Lowe's Cullman store, James Pirkle also was hired on the same day as John Castles, March 6, 1999, as a Customer Service Associate IV earning $9.00 an hour.[33]  Like Castles, he also worked in the Tool Department under plaintiff's supervision, and his job duties included assisting customers, stocking shelves, and recording special orders.  Engledow explained the basis for Pirkle's beginning wage-rate in his affidavit as follows:

> Mr. Pirkle was hired at a higher rate than Plaintiff because he was hired as back-up driver and possessed a Commercial Driver's License (which was a requirement to be a back-up driver).  According to Lowe's pay ranges, drivers were paid at a higher rate than other employees, including Assistant Zone Managers.  . . . Mr. Pirkle also had prior experience in almost every area of the store, including electrical, hardware, lumber, building materials, plumbing, and power tools.  In fact, Mr. Pirkle's experience and background in tools was so strong that he became a Tools Specialist in 2001.  At [the] time of Plaintiff's termination, Mr. Pirkle's pay rate was $9.80 per hour.[34]

According to Lowe's "Hourly Pay Ranges" chart, Grade 5, which was the highest pay grade, was reserved for drivers only.[35]  The beginning wage-rate in that grade ranged from $8.25 an hour for Step 1, to $10.00 an hour for Step 8.  Pirkle's starting wage-

---

[33]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 9, at 7.

[34]Doc. no. 36 (Defendant's Evidentiary Submission in Support of Motion for Summary Judgment), Ex. A (affidavit of Larry Engledow) ¶ 22.

[35]*Id.* at affidavit ex. 11.

11

rate corresponded with Step 4.

Engledow stated during deposition, however, that Pirkle was assigned to the Tool Department, and served as a driver on a few occasions, "but only as a backup."[36] Engledow further stated that Pirkle experienced medical problems shortly after he was hired, which rendered him unable to drive for a period of time.[37]

### 3.    Chris Williams

Apparently there were two employees named Chris Williams — one who worked in the Home Decor Department, and the other who was assigned to the Hardware Department. During plaintiff's deposition, she confirmed that for purposes of her Equal Pay Act claim, she was referring to the employee named Chris Williams who worked in the Home Decor Department, but in her brief she also identified the Chris Williams who worked in the Hardware Department as a comparator.[38]

According to Engledow's affidavit, Chris Williams began employment with Lowe's during November of 1997 at an hourly rate of $6.00.  Engledow stated that, "[d]uring the entire time that Mr. Williams was employed by Lowe's, his pay rate was

---

[36]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 2 (deposition of Larry Engledow), at 55.

[37]*Id.*

[38]*Compare* doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 1 (deposition of Kristy Gray), at 96-97 *with* doc. no. 44 (Plaintiff's Memorandum Brief in Opposition to Defendant's Motion for Summary Judgment), at 10.

lower than Plaintiff's by between $.75 to $1.00 per hour."[39]

The chart contained in the record reflecting the names, positions, pay rates, and dates of employment of employees in Lowe's Cullman store shows that an employee named Chris Williams was hired as a Cashier on October 18, 1997, earning $6.00 per hour.  The chart also shows that same employee received two raises while he occupied a Cashier II position, and that he held positions as Customer Service Associate III, Assistant Department Manager, and Department Manager, eventually earning an annual salary that was equivalent to a wage scale of $10.38 an hour.  He was employed by Lowe's until May 26, 2000.[40]

The chart also reflects that another employee named *Christopher Joseph Williams* was hired as a Customer Service Associate III on May 16, 1998, at the rate of $7.00 an hour.  He was employed by Lowe's until September 19, 1998.[41]

The chart does not indicate which of the employees named Chris Williams worked in the Home Decor Department, and which worked in the Hardware Department.

---

[39]Doc. no. 36 (Defendant's Evidentiary Submission in Support of Motion for Summary Judgment), Ex. A (affidavit of Larry Engledow) ¶ 23.

[40]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 9, at 9.

[41]*Id.* at 14.

### 4.    Bud Methvin

During her deposition, plaintiff identified "Bud" Methvin as another male employee who earned more than she did.[42]  Methvin was an hourly employee who worked in the Flooring Department, and who had prior work experience in the installation of carpeting.[43] According to Lowe's pay chart, an employee named *Amuel* Methvin was hired on March 14, 1998, as a Department Manager-in-Training, at the rate of $10.38 an hour.[44]

### 5.    Alan Rumsey

Alan Rumsey was an hourly employee who worked in the Flooring Department.[45] Lowe's pay chart is somewhat unclear as to the date on which Rumsey was hired, but the chart reflects that, throughout his employment with Lowe's, Rumsey held the position of Customer Service Associate IV and his pay ranged from $7.25 to $7.75 an hour.[46]

### 6.    Roy Holmes

Roy Holmes was hired as a Customer Service Associate IV on April 29, 1997,

---

[42]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 1 (deposition of Kristy Gray), at 106.

[43]*Id.* at 109.

[44]*Id.*, Ex. 9, at 19.  Another employee named *Darryl* Methvin was hired on October 3, 1998, as a Customer Service Associate IV, at the rate of $7.50 per hour.  *Id.* at 21.

[45]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 1 (deposition of Kristy Gray), at 111.

[46]*Id.*, Ex. 9, at 1.

at the rate of $7.00 an hour.[47]  Holmes also worked in the Flooring Department.[48]

### 7.    Joe Shannon

Joe Shannon was an hourly employee in the Home Decor Department.[49]  The record does not appear to contain information about his rate of pay.

### D.    Plaintiff's Complaints About Her Pay

Plaintiff first spoke to management personnel about her pay during the early part of 1998.  She complained to Charlie Brown, then Assistant Store Manager, and Fred Simpkins, who was Personnel Training Coordinator for the Cullman store, that she was paid less than Chris Williams.[50]  According to plaintiff, Brown and Simpkins told her that they would discuss her concerns with the Store Manager (then Bobby Bonds), but that Bonds would fire Williams for discussing his pay with another employee.[51]  Brown and Simpkins assured plaintiff that, if she waited until it was time for her next raise, she would "get a good raise then."[52]  Plaintiff decided not to pursue the matter further.  Larry Engledow, who was the Store Manager on the date

---

[47]*Id.* at 17.

[48]*Id.*, Ex. 1 (deposition of Kristy Gray), at 110.

[49]*Id.*, at 116.

[50]Plaintiff was referring to the employee named Chris Williams who worked in the Home Decor Department.  Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 1 (deposition of Kristy Gray), at 96-98.

[51]*Id.* at 97-98.

[52]*Id.* at 98.

plaintiff's employment was terminated, was not employed at the Cullman store during the time of these discussions.

In November of 1999, while plaintiff was Assistant Zone Manager for the Tool Department, she complained to Engledow that she was paid less than John Castles and James Pirkle, both of whom she supervised.[53] Engledow told her that Castles and Pirkle had experience which justified their higher pay; nevertheless, Engledow raised plaintiff's managerial salary to an amount that was equivalent to a wage-rate of $9.00 an hour,[54] because he believed plaintiff "was doing a good job" and deserved a raise.[55]

During her deposition, plaintiff testified that these were the only occasions on which she complained to management about her perception that she was being paid less than male employees.[56]

E.     **Lowe's Standards of Conduct**

Lowe's performance management policy identifies three categories of unacceptable performance or conduct. Class "A" violations include "the most serious misconduct and repeated job performance problems.   These serious violations

---

[53]*Id.* at 64.

[54]*Id.* at 83.

[55]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 2 (deposition of Larry Engledow), at 99.

[56]*Id.*, Ex. 1 (deposition of Kristy Gray), at 131.

normally will result in immediate discharge."[57] Examples of such violations include: dishonesty; unauthorized disclosure of company information; possession of explosives, firearms, knives or other dangerous weapons; verbal or physical abuse of employees, customers, or others on company property; use, sale, distribution or possession of illegal drugs during work hours; possession or use of alcoholic beverages during work hours; destruction or damage of property; unauthorized use of company property; and insubordination.

Class "B" violations include:

> serious acts, which indicate a disregard of established rules and/or standards of conduct but are not so serious as to compel immediate termination. Class "B" violations will normally result in a written warning for a first offense, final warning for a second offense and termination for a subsequent offense. Depending upon the severity of the infraction or past work history, termination may be appropriate for the first offense. An employee may commit multiple Class "B" violations that are not serious when considered separately, but when grouped together indicate a pattern of unacceptable behavior. In such cases, management should consider multiple Class "B" violations committed in a short period of time as grounds for more serious corrective action, up to and including termination.[58]

Examples of Class "B" violations include: violation of the employee purchase procedure; uncooperative behavior; violations of safety rules; cash variances; and failure to report an accident or unsafe condition.

---

[57]Doc. no. 36 (Defendant's Evidentiary Submission in Support of Motion for Summary Judgment), Ex. A (affidavit of Larry Engledow), affidavit ex. 12, at L0165.

[58]*Id.*

Class "C" violations "generally result[] in an initial verbal warning. . . . [A]n employee may commit multiple Class 'C' violations that, when considered together, are grounds for more serious corrective action." Examples include: failure to perform work satisfactorily; failure to complete work in a timely manner; violation of the attendance policy; violation of the dress code; and failure to notify and receive permission from a supervisor before leaving the assigned work area during working time.[59]

The performance management policy calls for a verbal warning to be given for Class "C" violations, which is documented on an Employee Counseling Report form, and filed in the employee's personnel file. A written warning is issued for Class "B" violations at the time of the first offense, or for repeated Class "C" violations. A "final notice" is given for repeated Class "B" violations or following a written warning for multiple Class "C" violations. A "final notice" is the last warning before termination. A "final notice" may be issued only by the Store Manager.[60]

According to the policy, a Class "A" violation usually results in immediate termination. Termination also may be warranted for repeated Class "B" or "C" violations, providing that appropriate corrective action sufficient to inform the

---

[59]*Id.* at L0167.
[60]*Id.* at L0168.

18

employee of his or her unacceptable behavior has been taken.[61]   Only the Store

Manager, in consultation with the District Manager, has authority to terminate an

employee.  The effective date of termination is considered to be the date the decision

to terminate is made, rather than the last day the employee worked.[62]

## F.   Plaintiff's Employment Record

Plaintiff received a written warning for tardiness on November 4, 1997.[63]  She

received another written warning on November 11, 1997.[64]   In that instance,

according to the "Incident Report" form authored by Terry Morgan, the Assistant

Store Manager on the date the event occurred, plaintiff

> was working on schedules in the zone managers office.  I told her she
> needed to hurry up and get back out on the sales floor.  Same day,
> working on cleaning out file cabinet.  Asked her to stop and come and
> assist with customer service.  She stated that she didn't know anything
> about anyone else's dept. and that she wasn't going to help them.  She
> also said she had checked her whole dept. and no one needed help.  I
> again told her to put away her papers and work the sale floor.  She said
> after she finished the file she was working on.

In the section of the form designated for employee comments, plaintiff wrote: "I was

doing customer service through SOS.  Terry was in a bad mood and taking it out on

---

[61]*Id.* at L0169.

[62]*Id.*

[63]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 1 (deposition of Kristy Gray), at deposition ex. 3.

[64]It appears that the warning was prepared by Mr. Morgan on November 8, 1997, but was not signed by plaintiff until November 11, 2004.

me.  I may not of [sic] acted in a manner that I should but he did not handle the situation appropriately either."[65]  When questioned about this incident during her deposition, plaintiff explained that Morgan angrily approached her while she was working on the file cabinet

> [a]nd he put his fist up to his face and started shaking it and walked straight up to me within a feets [sic] or so from me and shook his fist in my face.  And I don't remember his exact words, but he said it in a very threatening tone basically that I better put my stuff up.[66]

Morgan issued plaintiff another written warning on the same date — *i.e.,* November 11, 1997 — for the following reason:

> During a counseling session on 11/08/97 (with regards to customer service issues) Kristy began to roll her eyes, look up at the ceiling and present all the non-verbals of someone not listening to the other person. At that point, I asked her if I was boring her.  She said, frankly[,] yes you are.[67]

On December 1, 1999, plaintiff's supervisor Ben Campbell and assistant store manager Rhonda Mason issued plaintiff a written warning for "unauthorized schedule changes for weekend 12-03-99.  Specific dates 11-29, 30, 12-01, and 12-03-99."[68]

Plaintiff again received a written warning on July 12, 2000.  The following was

---

[65]*Id.* at deposition ex. 4.

[66]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 1 (deposition of Kristy Gray), at 173.

[67]*Id.* at deposition ex. 5.

[68]*Id.* at deposition ex. 6.

recorded by plaintiff's supervisor Michael Bates on an "Employee Counseling Report":

> Describe the Conduct/Performance:
>
> Kristy was scheduled to work LPD[69] trucks on 7-11-00 and 7-12-00 and should have been at work at 5:30 AM and came in on 7-11-00 at 6:55 AM and 7-12-00 at 7:00 AM.
>
> What is Expected in the Future:
>
> Report to work at scheduled times even when scheduled at 5:30 AM for LPD Trucks. Future incidents will result in further disciplinary actions up to and including termination.[70]

## G.    Plaintiff's Termination

On July 25, 2000, plaintiff was scheduled to work until 8:00 p.m.[71] Thirty minutes prior to the end of her shift, plaintiff called Michael Bates, an Assistant Store Manager, on an in-house telephone and told him that the Home Decor Department, for which she was responsible, was a "wreck," and that she would be leaving shortly. According to plaintiff, Bates said, "[I]t doesn't matter who we have to get over there, we'll get it cleaned up. Don't you worry about it."[72] Plaintiff left at the conclusion of her shift without cleaning up her department.

---

[69]This acronym is not explained in the record.

[70]*Id.* at deposition ex. 7.

[71]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 1 (deposition of Kristy Gray), at 295-96.

[72]*Id.* at 296.

At about 9:00 p.m., after the store closed and following plaintiff's departure, Bates "walked the store" — *i.e.,* inspected each department to ensure that stock was properly stored and that trash had been properly handled.[73] When he discovered that plaintiff had left for the evening without cleaning up the Home Decor Department, he instructed other employees not to help,[74] and he took photographs of the department.[75]

Plaintiff explained in deposition that she had been unusually busy that day due to the absence of another employee. Stock had been delivered to the store throughout the day and, because plaintiff was busy, she was unable to unpack and properly store all of the stock that had arrived. Plaintiff admitted that the department was "left in a mess," but maintained that she had understood, albeit mistakenly, that Bates would ask other employees to assist in restoring order to the department.[76]

The following day — *i.e.,* July 26, 2000 — Bates walked through the Home Decor Department at the beginning of his scheduled work shift at noon, to ascertain

---

[73]*Id.,* Ex. 5 (deposition of Michael Bates), at 50, 48.

[74]*Id.* at 52. Bates explained that although other associates were available to help, he told them instead to assist other workers who needed help because plaintiff had left without finishing the work for which she was responsible, despite his instructions to the contrary. *Id.* at 52-53.

[75]*Id.* at 56.

[76]*Id.,* Ex. 1, at 301-02. During his deposition, Bates stated that he told plaintiff that he expected her to continue to work on properly storing the stock that had been delivered and that he would ask other associates to assist as soon as they were available. *Id.,* Ex. 5 (deposition of Michael Bates), at 51.

plaintiff's progress in storing the freight and restoring the department to an orderly condition.[77]   He found that the department remained cluttered.[78]   At 12:30 that afternoon, Rhonda Mason, another Assistant Store Manager, also observed that the Home Decor Department still was in disarray.[79]

Mason and Bates asked plaintiff to report to the manager's office.   There, plaintiff was verbally counseled for failing to ensure that her department was properly "zoned" — *i.e.*, left in an orderly condition.[80]   Bates recorded the following statements on an "Employee Performance Report" form:

> Describe the conduct/performance (who, what, when, why, where and how).
>
> On 7-25-00 Kristy left her work area without being walked.  She had been instructed earlier that the department had to be perfect before we could leave.  She left at 8:00 pm and there were shopping carts of freight, empty boxes, trash and pallets throughout the area.  Kristy had ample time to complete her assigned task but failed to utilize her time.
>
> What is expected in the future?  Include follow-up dates.
>
> Kristy is expected to keep her area clean and unobstructed.  She is

---

[77]*Id.* at 63-64.

[78]*Id.* at 65.

[79]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 1 (deposition of Kristy Gray), deposition ex. 14.

[80]"Zoning" a department means "that merchandise is cleared from the floor, stocked, down stocked.  Zoning was having the shelves straightened and fronted out and faced, signs correct, pricing being accurate."  Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 2 (deposition of Larry Engledow), at 23.

expected to complete her given task before leaving.[81]

During plaintiff's meeting with Mason and Bates, she also was given a written warning for the following reason:

> On 7-25-00 Kristy left her work area in a mess. On 7-26-00 she came in at 10:00 AM and at 12:00 p.m. when I came in the department was in the same shape it was in when I walked it the night before. She had made no attempt to work the freight or even take the trash off the floor. Photos attached.[82]

The record contains Mason's written statement about the events of July 25, 2000:

> Around 6:00 pm on Tuesday July 25, 2000. I witnessed a phone conversation that Mike Bates had with Kristy Gray. Mike informed Kristy that her area had freight, trash and return items that needed to be put up before she left that evening. Mike informed Kristy that the Home Decor department had to be clean, neat and zoned before she went home and [he] expected her to stay and remove freight from [the] walking area of the aisles and get walked before she left the store. Kristy did not call Mike, me (Rhonda Mason) or Richard Thomas to walk her before she left. The area was unshoppable with freight blocking aisles, 2 buggies of trash, 2 buggies of returns and wall paper books scattered in area. I walked area at around 8:45 pm. The next day at 12:30 pm, I walked in the Home Decor area and it was still in the same condition as it was the night before. Kristy had clocked in at 10:00 AM and this was approximately 2 ½ hours into her shift. At this time, Mike Bates asked me to sit in on a counseling meeting with Kristy Gray.[83]

Rhonda Mason described the counseling meeting with Bates and plaintiff in the

---

[81]*Id.*, Ex. 1 (deposition of Kristy Gray), at deposition ex. 18.

[82]*Id.*

[83]*Id.* at deposition ex. 14.

following manner:

> On Wednesday, July 26, 2000 I was asked to sit in on a counseling meeting with Kristy Gray and Mike Bates. The meeting was in regards to the job performance of zoning activities for the previous night in Home Decor. The meeting was also about Kristy demonstrating insubordination towards Mike Bates in regards to the condition of the Home Decor Area. During the meeting, when Kristy was asked about the condition of the department and why she did not follow Mike's directions on proper clean-up, she demonstrated insubordination towards Mike Bates. Mike Bates was very calm and professional with his demeanor and voice. Kristy Gray became very aggressive, loud, and argumentative towards Mike Bates. The conversation was only about the condition of the department and Mike was informed by Larry Engledow to suspend Kristy until further notice ('til Larry could talk to her about her insubordination and lack of acceptable job performance). I then walked Kristy out. She proceeded to stop by the flooring department and began discussing the meeting with Becky Yancy and she stated to Becky that she was going to call the General Office. I told Kristy that she could not discuss the incident on the sales floor with other hourly associates and that any phone calls should be made on her own time. I also told Kristy that if she needed the toll free # for G.O. that we would provide that to her.[84]

Michael Bates recorded the following events in a contemporaneous written statement:

> On 7-26-00 at 11:30 AM I was in the store manager's office sitting at the desk checking my e-mail when Kristy came to the door. She seemed to be very upset. She stated that she was mad because she wanted vacation on 7-29-00 and 7-30-00. I explained to her that I had not received a request and it was to [sic] late to schedule her off. At this time she became very loud and told me that I was stupid if I thought it made her look bad because the Home Decor department was not

---

[84]*Id.* at deposition ex. 17.

properly zoned the previous night. She stated that if anyone looked bad it was me for not making the cashiers stay and clean up the mess. I told Kristy that I was not going to discuss the situation with her until Rhonda Mason (Zone Assistant) came in, and when I was ready to meet with her I would call her and we would meet in the zone manager's office. At this time she became real angry and shouted that I was not going to discuss a damn thing with her and that if I wanted to talk with her I better bring Larry [Engledow] (store mgr) with me, then she turned and walked out of the office. Misty Early was standing outside the office and witnessed the conversation. Misty even commented to me that she could not believe that Kristy had talked to me that way. I left the office and went to the Home Decor department. I told Kristy again that I would call her when I was ready to meet with her to discuss the situation. She stated that if I wanted to meet with her I would have to bring Larry with me because she refused to talk with me. Larry called the store about 30 minutes later and I informed him of the situation, he instructed me to suspend Kristy until further notice. At 1:30 I called Kristy and asked her to come to the zone manager's office. Rhonda Mason set [sic] in as a witness. When Kristy arrived she was very upset. I tried to talk with her about her attitude. I explained that she had no right to talk to me the way she had, and that I would not tolerate it. During the meeting Kristy was very loud and argumentative. She would not cooperate with me at all so I told her that she was suspended and asked her to call Larry and schedule a time to meet with him.[85]

Larry Engledow, who as Store Manager was the only person with authority to terminate employees, was not present at the store during the events described above, because he was not scheduled to work on those dates.[86] He telephoned the store to check in on July 26, 2000, and Bates told him what had occurred.[87]  Engledow

---

[85]*Id.* at deposition ex. 15.

[86]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 2 (deposition of Larry Engledow), at 135.

[87]*Id.*, Ex. 5 (deposition of Michael Bates), at 71.

instructed Bates to suspend plaintiff, and to direct her to contact him (Engledow) to schedule a meeting.[88]

On the day that Engledow returned to the store,[89] plaintiff met with him.[90] He listened to her version of events, and informed her that he had not completed his evaluation of the situation.[91]  Engledow also spoke with Bates and Mason, and reviewed their written statements.  Based upon the foregoing, Engledow concluded that plaintiff should be terminated for insubordination.[92]  Plaintiff telephoned Engledow the next day, and informed her of his decision.[93]

## H.    Facts Relating to Assault and Battery Claims

Plaintiff's assault and battery claims are based upon three incidents.  The first occurred when plaintiff's then-supervisor Terry Morgan shook his fist in her face.[94] Plaintiff next complains that, during November of 1999, Chris Williams, who was

---

[88]*Id.*

[89]The exact date of this event is not specified in the record.

[90]*Id.*, Ex. 2, at 136.

[91]*Id.*

[92]Doc. no. 36 (Defendant's Appendix in Support of its Motion for Summary Judgment), Ex. A (affidavit of Larry Engledow) ¶¶ 24-26.

[93]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 2 (deposition of Larry Engledow), at 137.  The "Personal Data Change" form associated with plaintiff's termination was completed and signed by Engledow, and indicates that the date of her termination was July 28, 2000.  *Id.*, deposition ex. 1.  There is another, unsigned "Personal Data Change" Form contained in the record, indicating that the termination date was July 29, 2000.  *Id.*, deposition ex. 2.

[94]*See supra* section II.F.

27

Assistant Zone Manager for the Hardware Department, placed a sticker on her chest.[95]

Finally, plaintiff states that during late 1999 or early 2000, Joe Shannon "poked his

fingers into plaintiff's side when she asked him not to do so."[96]

### III. DISCUSSION

**A.    Equal Pay Act Claim**

In order to avoid summary judgment on her Equal Pay Act claim, plaintiff bears

the initial burden of demonstrating that her employer pays a different wage to a male

employee "for equal work on jobs the performance of which requires equal skill,

effort, and responsibility, and which are performed under similar working conditions

. . . ." 29 U.S.C. § 206(d); *see also Corning Glass Works v. Brennan*, 417 U.S. 188,

195, 94 S. Ct. 2223, 2228, 41 L. Ed. 2d 1 (1974); *Arrington v. Cobb County,* 139 F.3d

865, 876 (11th Cir. 1998) (citing *Waters v. Turner, Wood & Smith Insurance Agency,*

*Inc.,* 874 F.2d 797, 799 (11th Cir. 1989)).

> The plaintiff need not prove that the job held by her male comparator is
> identical to hers; she must demonstrate only that the skill, effort, and
> responsibility required in the performance of the job are "substantially
> equal." 29 U.S.C. § 206(d)(1); *Corning Glass Works*, 417 U.S. at 204,
> 94 S. Ct. at 2232-33; *Brock v. Southwestern College*, 765 F.2d 1026,
> 1032 (11th Cir. 1985).  Although job titles are entitled to some weight

---

[95]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 1 (deposition of Kristy Gray), at 76-77.

[96]Doc. no. 44 (Plaintiff's Memorandum Brief in Opposition to Defendant's Motion for Summary Judgment), at 23; Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 1 (deposition of Kristy Gray), at 115, 123, 377.

> in this evaluation, "the controlling factor under the Equal Pay Act is job
> content" — the actual duties that the respective employees are called
> upon to perform. *Hodgson v. Behrens Drug Co.,* 475 F.2d 1041, 1049
> (5th Cir.), *cert. denied,* 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55
> (1973).

*Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1533 (11th Cir. 1992);

*see also Alford v. Cosmyl, Inc.,* 209 F. Supp. 2d 1361, 1371 (M.D. Ga. 2002) (holding

that "[t]he issue at the summary judgment stage is whether a reasonable jury could

conclude that [plaintiff's] job was substantially equal to the job of fellow male

employees, and yet she was [paid] less") (citing *Waters,* 874 F.2d at 799). Thus, the

core requirement for establishing a cognizable Equal Pay Act claim is that plaintiff

meet "the fairly strict standard of proving that she performed substantially similar

work for less pay" than a male counterpart. *Miranda,* 975 F.2d at 1526.

Once a plaintiff establishes a prima facie case, the burden shifts to the

employer to prove by a preponderance of the evidence that the pay differential is

justified by one of the four exceptions, or affirmative defenses, listed in the Equal Pay

Act itself. *See Corning Glass Works,* 417 U.S. at 196, 94 S. Ct. at 2229; *Irby v.

Bittick,* 44 F.3d 949, 954 (11th Cir. 1995); *Meeks v. Computer Associates

International,* 15 F.3d 1013, 1018 (11th Cir. 1994). Those exceptions are: "(i) a

seniority system; (ii) a merit system; (iii) a system which measures earnings by

quantity or quality of production; or (iv) a differential based on any . . . factor other

than sex."  29 U.S.C. § 206(d)(1).  The employer's burden of proof for those affirmative defenses is a "heavy one," because it "must show that the factor of sex provided no basis for the wage differential."  *Irby*, 44 F.3d at 954 (quoting *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 590 (11th Cir. 1994) (internal quotation marks omitted)).

If the employer carries that burden, "the plaintiff must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based discrimination. . . .  If plaintiff is able to create the inference of pretext, there is an issue which should be reserved for trial."  *Irby*, 44 F.3d at 954 (citations omitted).

It follows, therefore, that plaintiff first must show that she performed work in a position requiring substantially equal skill, effort, and responsibility under similar working conditions as one of her male comparators.  Applying that standard, plaintiff has failed to establish that the following employees are proper comparators:  the employee named Chris Williams who was the Assistant Zone Manager for the Hardware Department; the employee named Chris Williams who was an hourly-wage employee in the Home Decor Department; Bud Methvin, an hourly-wage employee in the Flooring Department; Alan Rumsey, an hourly-wage employee in the Flooring Department; Roy Holmes, an hourly-wage employee in the Home Decor and Flooring

Departments; and Joe Shannon, an hourly-wage employee in the Home Decor department. In her brief, plaintiff asserts only that these persons are "comparators," without any analysis of whether they, in fact, performed substantially equal work. The remaining two employees that plaintiff has identified as comparators bear more scrutiny.

James Pirkle and John Castles both were employed as Customer Service Associates in the Tool Department under plaintiff's supervision, during the period she held the managerial position of Assistant Zone Manager. The court's evaluation of these persons is hampered by plaintiff's failure to provide a description of her duties as an Assistant Zone Manager in the Tool Department. Even so, some information can be gleaned from the record. In support of its motion for summary judgment, Lowe's provided the affidavit of Larry Engledow, in which he stated that "Ms. Gray's primary responsibility was to assist in the management of the Tool Department; whereas Mr. Castle's [sic] primary responsibility was to use his background and product knowledge in Tools to sell merchandise."[97]

During her deposition, plaintiff stated:

> [Engledow] told me that [Pirkle and Castles] had experience, and I didn't feel like their experience really had anything to do with house building tools. And John was a mechanic, I believe. I'm not for sure.

---

[97]Doc. no. 36 (Defendant's Evidentiary Submission in Support of Summary Judgment Motion), Ex. A ¶ 21.

And that doesn't really have anything to do with home building tools either.

And after I was in the department for just a couple of weeks, I knew just as much as they did about the tools in the department.[98]

Additionally, Lowe's asserts in its brief that "[p]laintiff's primary job responsibility was to help *manage* the Tools Department,"[99] whereas the primary responsibility of her subordinate John Castles was to *sell* Lowe's products. Engledow stated during deposition that Castles and Pirkle assisted customers, stocked shelves, audited prices, and placed special orders.[100]

Based on the foregoing, the court concludes that plaintiff has not met the "fairly strict standard of proving that she performed substantially similar work for less pay" than any of her comparators. The record is devoid of a description of plaintiff's duties as Assistant Zone Manager and a comparison of her duties with those of her subordinates who worked in the Tool Department and were paid more than she was. Moreover, plaintiff does not contest Lowe's contention that her job duties in the Tool Department were primarily *management*, as opposed to *sales*, or any of the other duties performed by her comparators. Instead, she makes only an unsupported

---

[98]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 1 (deposition of Kristy Gray), at 68.

[99]Doc. no. 35 (Defendant's Memorandum in Support of its Motion for Summary Judgment), at 16 (emphasis in original).

[100]Doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 2 (deposition of Larry Engledow), at 123.

assertion that "Mr. Castles' and Mrs. Gray's job positions were substantially equal, but Mr. Castles was paid different wages for equal work as compared to Mrs. Gray."[101]  Likewise, plaintiff states that "Mr. Pirkle's and Mrs. Gray's job positions were substantially equal, but Mr. Pirkle was paid different wages for equal work as compared to Mrs. Gray."[102]  Those statements, without more, are insufficient to satisfy plaintiff's burden to establish a *prima facie* case.  Accordingly, defendant's motion for summary judgment is due to be granted with respect to plaintiff's Equal Pay Act claim.

## B.      Retaliation Claim

Plaintiff contends that she was terminated in retaliation for her complaints to management about unequal pay.  Lowe's contends that plaintiff was terminated for misconduct.

The anti-retaliation provision of the Fair Labor Standards Act of 1938 ("FLSA"), of which the Equal Pay Act is a part, provides that it is unlawful for an employer

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is

---

[101]Doc. no. 44 (Plaintiff's Memorandum Brief in Opposition to Defendant's Motion for Summary Judgment), at 15.

[102]*Id.* at 16.

about to serve on an industry committee.

29 U.S.C. § 215(a)(3).

In order to establish a *prima facie* case of retaliation under the FLSA, a plaintiff must show the following:  she engaged in statutorily protected activity; an adverse employment action occurred; and there was a causal link between the activity and the adverse employment action. *Cf. Wolf v. Coca-Cola Company*, 200 F.3d 1337, 1342-43 (11th Cir. 2000) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205-208-09 (10th Cir. 1997)). "If the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext. . . . In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken 'but for' the assertion of [Equal Pay Act] claims." *Wolf*, 200 F.3d at 1343 (citation omitted).

Lowe's first contends that plaintiff's complaints to management about perceived pay disparity do not constitute protected activity.  The Eleventh Circuit, however, has held the contrary:

> The charging parties did not perform an act that is explicitly listed in the FLSA's anti-retaliation provision; however, we conclude that the unofficial complaints expressed by the women to their employer about unequal pay constitute an assertion of rights protected under the statute. The FLSA in general is remedial in purpose *See Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597, 64 S. Ct. 698, 702, 88 L. Ed. 2d 949 (1944). "For . . . practical and other reasons," Congress sought to secure compliance with the substantive provisions of the labor statute by having "employees seeking to vindicate rights

34

claimed to have been denied" lodge complaints or supply information to officials regarding allegedly substandard employment practices and conditions. *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292, 80 S. Ct. 332, 335, 4 L. Ed. 2d 323 (1960). The anti-retaliation provision of the FLSA was designed to prevent fear of economic retaliation by an employer against an employee who chose to voice such a grievance. *Id.* By giving a broad construction to the anti-retaliation provision to include the form of protest engaged in here by the charging parties, its purpose will be further promoted. *See also Love v. Re/Max of America,* 738 F.2d 383, 387 (10th Cir. 1984) (anti-retaliation provision of FLSA applies to employee who sent memorandum to employer requesting raise with copy of EPA attached and was fired within two hours).

*Equal Employment Opportunity Commission v. White and Son Enterprises*, 881 F.2d 1006, 1011-12 (11th Cir. 1989). In view of the foregoing, the court finds that plaintiff has established that she engaged in protected activity by virtue of her complaints about unequal pay in 1998 to Assistant Store Manager Charlie Brown and Personnel Training Coordinator Fred Simpkins, and in November of 1999 to Store Manager Larry Engledow.

Plaintiff also has shown that the ultimate adverse employment action was taken against her — *i.e.*, her employment was terminated during July of 2000. Accordingly, she has satisfied the second element of a *prima facie* case for retaliation.

With respect to the causation element, "a close temporal proximity between two events may support a finding of a causal connection between those two events." *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (citing

35

*Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (stating that the "general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection")).

Here, plaintiff complained to management about unequal pay during 1998 and November of 1999, and her employment was terminated during July of 2000.[103] Clearly, plaintiff's 1998 complaints are too remote to constitute circumstantial evidence that her termination was retaliatory. As for the more recent complaint, approximately eight months passed[104] between the time plaintiff complained to Engledow that she was paid less than her subordinates Castles and Pirkle and the date on which she was terminated.

The Eleventh Circuit has held that a three and one-half month period between an employee's protected activity and her termination is not sufficient, standing alone, to demonstrate a causal connection between the two events. *Wascura*, 257 F. 3d at

---

[103]Although plaintiff asserts in her brief that "as recently as a week or so before her termination at the end of July 2000, she had complained about pay inequality of female and male employees at Lowe's," this statement is unsupported by the evidence, and is directly contradicted by plaintiff's confirmation during her deposition that the 1998 complaints to Brown and Simpkins, and in 1999 to Engledow were the only occasions on which she complained to management about unequal pay. *See* doc. no. 44 (Plaintiff's Memorandum Brief in Opposition to Defendant's Motion for Summary Judgment), at 21; doc. no. 43 (Plaintiff's Evidentiary Submission in Opposition to Defendant's Motion for Summary Judgment), Ex. 1 (deposition of Kristy Gray), at 131.

[104]Defendant incorrectly asserts that plaintiff's November 1999 complaints occurred "a year and a half" prior to her termination during July of 2000. Doc. no. 35 (Defendant's Memorandum in Support of its Motion for Summary Judgment), at 23.

1245. Likewise, the court cannot conclude that the eight-month period between plaintiff's complaints to management about unequal pay and her termination are sufficiently close in time as to create a genuine issue of material fact with respect to a causal connection between the events. For these reasons, the court concludes that plaintiff has failed to establish a causal link between her protected activity and termination of her employment.

Further, based upon the evidence, the court cannot conclude that, "but for" her protected activity, plaintiff would not have been terminated. Plaintiff's retaliation claim is undercut by the fact that, when she complained to Engledow about being paid less than Castles and Pirkle, he gave her a substantial pay raise. Moreover, the record demonstrates that plaintiff was disciplined, and ultimately terminated, for insubordination. Plaintiff has not contested that the events forming the basis of her termination occurred. Accordingly, defendant's motion for summary judgment is due to be granted with respect to plaintiff's retaliation claim.

## C.    State Law Claims

### 1.    Assault and battery

The tort of assault is defined in Alabama as

an intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a wellfounded fear of an imminent battery,

37

coupled with the apparent present ability to effectuate the attempt, if not
prevented.

*Allen v. Walker*, 569 So. 2d 350, 351 (Ala. 1990) (citations and internal quotation
marks omitted). "A successful assault becomes a battery, which consists of the
touching of another in a hostile manner." *Wright v. Wright*, 654 So. 2d 542, 544 (Ala.
1995) (citing *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986)). "The wrong
'consists, not in the touching, so much as in the manner or spirit in which it is done,
and the question of bodily pain is important only as affecting damages.'" *Portera v.
Winn Dixie of Montgomery Inc.*, 966 F. Supp. 1418, 1437 (M.D. Ala. 1998) (quoting
*Surrency*, 489 So. 2d at 1104).

### 2. Statute of Limitations

As discussed in Part II.H above, plaintiff's claims of assault and battery are
based upon three incidents: during November of 1997, Terry Morgan shook his fist
in her face and angrily spoke to her; during November of 1999, Chris Williams placed
a sticker on plaintiff's chest; and in late 1999 or early 2000, Joe Shannon poked
plaintiff in her sides with his fingers.

Plaintiff contends that Alabama's six-year statute of limitations pertaining to
actions for assault and battery, Alabama Code § 6-2-34(1), applies here. Defendant
argues that, instead, the two-year statute of limitations in Alabama Code § 6-2-

38

38(n)[105] applies, and bars plaintiff's claims.  Alabama Code § 6-2-38(n) reads as

follows:  "All actions commenced to recover damages for injury to the person or

property of another wherein a principal or master is sought to be held liable for the

act or conduct of his agent, servant, or employee under the doctrine of respondeat

superior must be brought within *two years*."  *Id.* (emphasis supplied).

Here, plaintiff has brought assault and battery claims only against Lowe's, and

asserts a theory of liability based upon the actions of its employees.  Accordingly, the

two-year statute of limitations applies.  *See Wint v. Alabama Eye & Tissue Bank*, 675

So. 2d 383, 386 (Ala. 1996) ("[T]he two-year limitation of § 6-2-38(n) applies to bar

a plaintiff's complaint against an employer based upon the intentional torts of the

employer's servants, unless the plaintiff's 'allegations and proof show' that the

defendant employer directed, aided, participated in, or ratified the alleged tortious

conduct of the servant.").  Since all of the actions about which she complains

occurred more than two years prior to the date on which plaintiff commenced this

action in state court — *i.e.,* July 30, 2002 — and also because plaintiff has not argued

that Lowe's directed, aided, participated in, or ratified the alleged conduct, her state

law claims are time-barred.[106]

---

[105]In its brief, defendant incorrectly cited the applicable provision as Ala. Code § 6-2-38(*l*).

[106]Issues and contentions not raised in a party's brief are deemed abandoned. *See, e.g.,
Chapman v. AI Transport* 229 F.3d 1012, 1027 (11th Cir. 2000) (en banc) ("Parties opposing
summary judgment are appropriately charged with the responsibility of marshaling and presenting

## IV. CONCLUSION

For all the foregoing reasons, defendant's motion for summary judgment is due to be granted.  A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this _11th_ day of March, 2004.

United States District Judge

---

their evidence before summary judgment is granted, not afterwards.").